710 A.2d 332

Thomas J. MURPHY, III

v.

24TH STREET CADILLAC CORPORATION
t/n Chesapeake Cadillac Jaguar, et al.

No. 1246, Sept. Term, 1997.

Court of Special Appeals of Maryland.

May 4, 1998.

Reconsideration Denied June 23, 1998.

**456**

Thomas G. Bodie and Kelly A. Koermer (Rodie, Nagle, Dolina, Smith & Hobbs, P.A. on the brief), Towson, for Appellant.

Samuel Y. Botts (Roger K. Clark, Jr. and Jessamy, Fort & Botts in the brief), Washington, DC, for Appellees.

Argued before EYLER and SONNER, JJ., and PAUL E. ALPERT, Judge (retired), Specially Assigned.

PAUL E. ALPERT, Judge (retired), Specially Assigned.

Appellant, Thomas J. Murphy, III, filed suit against appellees, Chesapeake Cadillac Jaguar ("Chesapeake") and General Motors Corporation ("GM"), in the Circuit Court for Baltimore County alleging violations of express warranties made pursuant to Md.Code (1997 Repl.Vol.) § 2–313 of the Commercial Law Article ("C.L."), and the implied warranty of merchantability made pursuant to C.L. § 2–314, and sought damages pursuant to C.L. § 14–2004. The circuit court (Cadigan, J.) at a bench trial, ruled in favor of appellees. Mr. Murphy filed a timely appeal.

### ISSUES

Appellant raises four issues, which we rephrase:

I.   Did the circuit court interpret § 14–2004(e)(1) to require a lessee to demonstrate that he allowed a lessor at least four repair attempts in order to establish that he allowed the lessor a "reasonable number" of repair attempts under § 14–2004(d)?

II.   Did the circuit court err by failing to rule that Murphy was entitled to a presumption that he had allowed a "reasonable number" of repair attempts pursuant to § 14–2004(e)(3)?

III.   Did the circuit court err by ruling that Murphy failed to allow appellees a "reasonable number" of repair attempts?

IV.   Did the circuit court commit reversible error by considering Murphy's refusal to accept a replacement vehicle from appellees?

## FACTS [1]

On February 26, 1996, Mr. Murphy entered into a lease with Chesapeake. Under the lease, Mr. Murphy received, at a monthly rate of $930.74, the use of a brand new Cadillac STS automobile for 24 months. He also received a standardized GM warranty.

A few weeks after he received the vehicle, Mr. Murphy noticed a problem with the car's sound system. Thus, on March 21, 1996, he took the car back to Chesapeake to have the problem repaired.

After Chesapeake repaired and returned the automobile, Mr. Murphy began to notice a second problem: on occasion, the car would hesitate during acceleration. Thus, he returned to Chesapeake on April 16, 1996 to have their mechanics check into the hesitation problem.

Chesapeake kept the car overnight, but its mechanics were unable to duplicate the hesitation problem. Nevertheless, Chesapeake contacted GM about the condition. GM responded by notifying Chesapeake that it was aware that the STS model occasionally suffered from a hesitation problem, and that it would—at an unspecified date in the future—send a

---

**1.**   The facts we present here are those found by the circuit court. They correspond, in their essentials, with those presented by Mr. Murphy in his brief.

representative to Chesapeake with a "recalibration chip," which would be used to correct the condition.

After receiving this information from GM, Chesapeake relayed it to Mr. Murphy. It also returned the car to him, and told him to continue driving it until the recalibration chip arrived.

Several days after Chesapeake returned the car to Mr. Murphy, it stalled at a traffic light. On April 24, 1996, Mr. Murphy called GM to report this incident and to request that GM repurchase or replace the car. GM took note of Mr. Murphy's complaint, but took no immediate action on the problem. Mr. Murphy continued to drive the automobile.

On April 28, 1996, the car stalled again, this time while Mr. Murphy was attempting to turn onto a U.S. highway. As a result of the stall, Mr. Murphy's car was nearly struck by another. Fortunately, it was able to stop just in time. The next day—April 29, 1996—Mr. Murphy took the automobile back to Chesapeake for further repairs.

Chesapeake worked on the car for several days, and notified GM of the additional stalling problem. Because the recalibration chip had not yet arrived, Chesapeake was forced to try other methods of repair. On May 2, 1996, Chesapeake returned the car to Mr. Murphy.

For a short while after the return of the vehicle, Mr. Murphy noticed an improvement. Nevertheless, the car stalled again in mid May, and yet again in late May. On May 27, 1996, Mr. Murphy called GM again to report these latest incidents and to ask to be released from the lease. Again, GM apparently took no immediate action on this complaint, and in the first week of June, Mr. Murphy stopped driving the car altogether.

On June 11, 1996, Mr. Murphy called Chesapeake and told them that, although he wanted out of the lease, he would give them one last opportunity to fix the problems with the car. Chesapeake responded by telling Mr. Murphy that the recalibration chip had arrived, and that he could bring the car in on

June 17, 1996 to have the repairs done. Mr. Murphy, in turn, told Chesapeake that he was not willing to wait six days to have the car repaired, and refused that offer. Mr. Murphy then had his attorney inform Chesapeake, via a letter dated June 11, 1996, that he wanted the lease terminated and the car taken back.

An unspecified number of days after June 11, 1996, Chesapeake called Mr. Murphy at work to inform him that he could bring the car in that day for repairs. Mr. Murphy refused this offer. Then, on June 27, 1996, GM wrote to Mr. Murphy offering to replace the car in his possession. Again, Mr. Murphy refused this offer and subsequently filed his lawsuit on July 5, 1996.

## DISCUSSION

Before we address the issues raised by appellant, it is important that we make some preliminary points clarifying the nature of his suit against appellees.

The complaint contains three separate counts against appellees. One alleges that appellees violated express warranties issued pursuant to C.L. § 2–313 and asks for damages of $43,995.52. The second alleges that appellees violated the warranty of merchantability implied pursuant to C.L. § 2–314 and asks for damages of $43,995.52. The third (listed first in the complaint) alleges that appellees violated express warranties issued pursuant to C.L. § 2–313, and the warranty of merchantability implied pursuant to C.L. § 2–314, and seeks damages of $46,753.32 pursuant to C.L. § 14–2004.

Notwithstanding that Mr. Murphy asserted three separate claims in his complaint, the trial focused on only one of those—the claim for damages pursuant to C.L. § 14–2004. Further, the issues in this appeal deal solely with Mr. Murphy's C.L. § 14–2004 claim. Thus, we will deal here only with the C.L. § 14–2004 claim, and not with either of the claims advanced pursuant solely to Title 2 of the Commercial Law Article.[2]

---

**2.** It is unlikely that Mr. Murphy could have proceeded on either of the claims filed solely under Title 2. That is because Title 2—which is part

The primary purpose of C.L. § 14–2004 is to apply the warranty provisions of Title 2 (§§ 2–313 through 2–318) to leases of motor vehicles. *See* C.L. § 14–2004(a). If any warranty established pursuant to those Title 2 provisions (*i.e.* the implied warranty of merchantability, express warranties, an implied warranty of fitness for a particular purpose) are violated, C.L. § 14–2004 requires the lessee to give notice of the defect to the lessor, factory branch, authorized dealer, or manufacturer by certified mail, return receipt requested, and to allow the lessor, factory branch, authorized dealer, or manufacturer an opportunity to fix the defect. *See* C.L. § 14–2004(c)(1) and (2). Further, the lessor, factory branch, authorized dealer, or manufacturer must fix the problem at no cost to the lessee. *See* C.L. § 14–2004(c)(3). If the lessor, factory branch, authorized dealer, or manufacturer cannot fix the defect after a reasonable number of attempts, the lessee has a choice of two alternative remedies: 1) accept a comparable replacement vehicle; or 2) return the defective vehicle and accept, in compensation, all monies paid (by the lessee) to repair the defect, and all other monies paid (also by the lessee) "due" to the defect. *See* C.L. § 14–2004(d). Section 14–2004(e) sets forth three different factual scenarios which, if established by the lessee, give rise to a rebuttable presump-

---

of the Maryland Uniform Commercial Code—deals with the sale of goods, and not with leases. It is true that, facially, the scope of Title 2 is relatively broad; § 2–102 provides that "[u]nless the context otherwise requires," Title 2 "applies to transactions in goods[.]" *See Burton v. Artery Company, Inc.,* 279 Md. 94, 113, 367 A.2d 935 (1977) (Stating, in *dicta,* that "[i]t is important to bear in mind that § 2–102 says that it is 'transactions in goods' to which Title 2 of the UCC is to apply '[u]nless the context otherwise requires,' a term said to be broader than the sale of goods."). It is also true that, although Maryland courts have never decided the question, courts in other jurisdictions have—at least prior to the enactment of Title 2A of the Uniform Commercial Code— applied Title 2 of the UCC to leases. *See generally* 1 White & Summers, *Uniform Commercial Code* § 1–1, n. 9 (4th Ed.1995) and the cases cited therein. Nevertheless, the existence of provisions like § 14–2004 indicates that the legislature did not intend Title 2 to apply to leases. Further, in 1994, the legislature adopted Title 2A of the UCC, which applies specifically to leases. Thus, although we pointedly do not decide the question here, it would appear that a party to a lease must, as a general rule, seek a remedy pursuant to Title 2A, and not Title 2.

tion that a reasonable number of attempts at fixing the defect were afforded.

Here, Mr. Murphy claims that the circuit court misinterpreted one part of C.L. § 14–2004(e), improperly failed to apply another part of C.L. § 14–2004(e), erred by failing to find that he allowed appellees a reasonable number of repair attempts, and erred by taking into account his decision not to accept a replacement vehicle. We address each contention in turn.

### I. Circuit Court's Interpretation Of C.L. § 14–2004(e)

Again, Mr. Murphy phoned Chesapeake on June 11, 1996, ostensibly to give them one last chance to repair his vehicle. Chesapeake informed him that it had received the recalibration chip, and that he could bring the vehicle back in for repairs on June 17. Mr. Murphy, in turn, felt that six days was too long to wait, and refused Chesapeake's offer.

In its oral opinion, the circuit court made the following statement with respect to that refusal by Mr. Murphy:

> This Court finds it was unreasonable on the part of Mr. Murphy to not wait that six days to see if Chesapeake could repair this vehicle. Accordingly, the Court finds that Chesapeake was not given a reasonable opportunity to perform the repairs which could have cured this particular problem. The statute requires that the dealer be given a reasonable number of attempts to undertake to conform the motor vehicle to the applicable warranties under 14–2004(3)(e) and the Court finds that it was Mr. Murphy, instead, chose to continue to obligate himself on the lease through March of 1998 rather than take advantage of an offer to repair the car within the six days after his call to Chesapeake.

Mr. Murphy argues that this passage indicates that the circuit court interpreted C.L. § 14–2004(e) to require a lessee to establish one of the factual scenarios contained in that subsection in order to establish that he afforded the lessor a reasonable number of opportunities to repair the vehicle. We disagree.

Before we address the meaning of the circuit court's ruling, it is important that we first address a dispute about the effect of C.L. § 14–2004(e). That subsection provides as follows:

(e) *When presumption that a reasonable number of attempts to conform vehicle to applicable warranties arises.*— It shall be presumed that a reasonable number of attempts have been undertaken to conform a motor vehicle to the applicable warranties if:

(1) The same nonconformity, defect, or condition has been subject to repair 4 or more times by the manufacturer or factory branch, or its agents or authorized dealers, within the warranty period but such nonconformity, defect, or condition continues to exist;

(2) The motor vehicle is out of service by reason of repair of 1 or more nonconformities, defects, or conditions for a cumulative total of 30 or more days during the warranty period; or

(3) A nonconformity, defect, or condition resulting in failure of the braking or steering system has been subject to the same repair at least once within the warranty period, and the manufacturer has been notified and given the opportunity to cure the defect, and the repair does not bring the vehicle into compliance with the motor vehicle safety inspection laws of the State.

■ As Mr. Murphy correctly points out, this subsection simply provides that when a lessee has established one of the factual scenarios listed, there is a presumption that the lessee has afforded the lessor a reasonable number of opportunities to repair the vehicle, and the burden of production and persuasion on that issue shifts to the lessor. It should be clear, however, that subsection (e) does not require that a lessee establish one of the listed factual scenarios in order to establish that he afforded the lessor a reasonable number of opportunities to repair; contrary to the strenuous assertions of appellees, it is possible for a lessee to demonstrate that he gave the lessor a reasonable number of tries without establishing one of the factual scenarios listed in C.L. § 14–2004(e).

■ That said, we disagree with Mr. Murphy's assertion that the circuit court interpreted C.L. § 14-2004(e) to require a lessor to establish one of the listed factual scenarios in order to demonstrate that he afforded the lessor a reasonable number of repair attempts. We read the relevant passage of the lower court's opinion—set forth above—to simply hold that Mr. Murphy did not allow a reasonable number of repair attempts. In spite of the court's mention of C.L. § 14-2004(e), we do not read that passage to interpret C.L. § 14-2004(e) to require that a lessee establish one of the three factual scenarios listed in order to demonstrate that he gave the lessor a reasonable number of repair attempts. Indeed, we believe that the mention of C.L. § 14-2004(e) was an inadvertent error which had no effect on the interpretation of the opinion as a whole.[3] Thus, we reject Murphy's first assignment of error.

## II. Failure To Find Presumption Under C.L. § 14-2004(e)(3)

Again, under C.L. § 14-2004(e)(3), a presumption that a lessee gave a lessor a reasonable number of opportunities to fix a defective automobile arises if:

---

3. Our interpretation of the circuit court's opinion is in accordance with established principles of appellate review. Although we will not perform undue contortions to interpret a lower court's decision in a way that warrants an affirmance, we will make reasonable presumptions and inferences about the nature of that decision in favor of the correctness of the decision. *See* 5 C.J.S. *Appeal and Error* § 766 (1993) ("While there are limitations on the power of an appellate court to indulge in presumptions in support of orders or judgments, generally an appellate court will indulge all reasonable presumptions in favor of the correctness of the judgment, order, or decree from which the appeal was taken. Indeed, error is never to be presumed by an appellate court on an appeal thereto. Presumptions which would result in a reversal will not be indulged."). *Cf. Food Fair Stores v. Lascola*, 31 Md.App. 153, 165, 355 A.2d 757 (1976) (Under rule providing for jury to make special written findings upon issues of fact, jury trial may be waived as to issue omitted from those submitted to jury, and court may make finding; but if it fails to do so, it is deemed to have made finding in accord with judgment).

A nonconformity, defect, or condition resulting in failure of the braking or steering system has been subject to the same repair at least once within the warranty period, and the manufacturer has been notified and given the opportunity to cure the defect, and the repair does not bring the vehicle into compliance with the motor vehicle safety inspection laws of the State.

Mr. Murphy argues that the circuit court erred in failing to recognize this presumption because the defect in his vehicle involved the braking and steering systems, and was subject to the same repair at least once during the warranty period. The flaw in this argument is that, although he allowed the dealer an opportunity to correct the problem, he never afforded a similar opportunity to the manufacturer, i.e., he would not wait six days to have the manufacturer's recalibration chip installed. Forwarding the chip was, implicitly, the manufacturer's effort to cure the defect. Mr. Murphy effectively denied GM "the opportunity to cure the defect." The trial judge was not clearly erroneous in finding that Mr. Murphy was "unreasonable" in declining to wait the six days. What is "reasonable" is for the trier of fact. In *Davis v. DiPino*, 121 Md.App. 28, 708 A.2d 357 (1998), Judge Hollander, for a majority of the Court, said (121 Md.App. at 47–48, 708 A.2d at 367):

When the trial court sits as the trier of fact, our review of its factual findings is governed by the "clearly erroneous" rule embodied in Md. Rule 8–131(c). *See Barnes v. Children's Hosp.*, 109 Md.App. 543, 552–53, 675 A.2d 558 (1996); *Kelly Catering, Inc. v. Holman*, 96 Md.App. 256, 269, 624 A.2d 1300 (1993), *aff'd*, 334 Md. 480, 639 A.2d 701 (1994). So long as the trial court's factual findings are supported by "any competent, material evidence," then we cannot set those findings aside as clearly erroneous, "even if we might have found otherwise." *Barnes*, 109 Md.App. at 553, 675 A.2d 558. Moreover, we must view the evidence, and all inferences fairly deducible from the evidence, in the light most favorable to the prevailing party. *Id.*

## III. Lack Of A Reasonable Number Of Repair Attempts

Mr. Murphy also argues that the circuit court erred when it ruled that he did not afford appellees a reasonable number of opportunities to fix his automobile. Again, we disagree.

To support his argument, he asks us to adopt—for the purpose of determining reasonableness—the criteria listed in *Dreher v. Hood Motor Company, Inc.,* 492 So.2d 132 (La.App. 1 Cir.1986). Those criteria include the following: whether the lessee was afforded substitute transportation; the extent to which the lessee's lifestyle was disrupted by the unavailability of the vehicle; the nature of the defect; the difficulty of remedy; and the number of unsuccessful repair attempts. *Id.* at 137.

■ We recognize the absence of Maryland cases providing guidance on this question (as well as the sparsity of such caselaw generally); for that reason, we find the criteria listed in *Dreher* somewhat persuasive. Nevertheless, because it was enacted by the Maryland legislature (and is therefore an indicia of what the Maryland legislature deems important), we believe that the better source of criteria for determining reasonableness is C.L. § 14–2004(e)—the statute governing presumptions. An examination of the factual scenarios listed in C.L. § 14–2004(e) reveals that the following should be considered when determining whether a lessee gave a lessor a reasonable number of opportunities to repair: the number of previous repair attempts; the length of time the automobile was out of service during previous repair attempts; the difficulty (or ease) of fixing the defect; and the nature of the danger presented by the defect.

We do not mean to suggest that these are the only criteria that may permissibly be considered when determining whether a reasonable number of repair attempts were allowed. Nevertheless, because they derive from the statute itself, they are the most important; and they should be considered together, and not in isolation.

■ With these criteria in mind, we believe that the circuit court correctly ruled that Mr. Murphy did not give appellees a reasonable number of opportunities to fix the vehicle. Although the danger presented by the defect was clearly quite severe, the defect was also apparently somewhat complex and difficult to fix, and Mr. Murphy only gave appellees (at most) two chances to fix it. Further, between the date he received the automobile and June 11, 1996—the day he decided that he would not accept any more repair attempts—the automobile was out of service for no more than two weeks (including the period when he determined the car too dangerous to drive). Finally, these problems occurred over a relatively short span—two months—and did not drag on for an unreasonable length of time. Thus, Mr. Murphy's third assignment of error is without merit.

### IV.   Mr. Murphy's Refusal To Accept
### A Replacement Vehicle

■ Again, in late June of 1996, GM offered to replace the vehicle, but Mr. Murphy refused that offer. At trial, the circuit court held that refusal against Mr. Murphy, stating:

In addition, Mr. Roberts, the Regional Manager, was in touch with Mr. Murphy's law firm or Mr. Bodie's law firm and also wrote a letter. I don't have it before me, but my recollection is June 27th, in which he offered to provide Mr. Murphy with a comparable motor vehicle, which was in compliance with Section 10–2004(2)(iii), but at that time Mr. Murphy had lost confidence in Cadillac and General Motors and declined. That would have been an opportunity for Mr. Murphy to have turned in the vehicle that had been giving him problems and attempt to or to drive a comparable vehicle without incurring payments under his lease for no vehicle and the Court finds it was unreasonable on the part of Mr. Murphy not to accept the offer of the Regional Manager to drive a comparable vehicle.

In this appeal, Mr. Murphy argues that the circuit court erred by holding that refusal against him. The circuit court's consideration of Mr. Murphy's refusal to accept the replace-

ment may have been erroneous. Under C.L. § 14–2004(d), a lessee who has given a reasonable number of opportunities to repair is entitled to **either** a replacement vehicle or reimbursement of money paid because of the defect. But it makes no difference. Since Mr. Murphy did not allow a reasonable number of repair attempts, any error in that regard did not prejudice Mr. Murphy, and a reversal on that ground is not warranted.

**JUDGMENT AFFIRMED.**

**APPELLANT TO PAY THE COSTS.**